## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVEN STONE and SHIRLEY ALBRIGHT, individually and on behalf of all others similarly situated, | No. 1:20-cv-3232 |
| Plaintiffs, | **CLASS ACTION** |
| vs. | **JURY TRIAL DEMANDED** |
| SUBARU OF AMERICA, INC., a New Jersey Corporation, and SUBARU CORPORATION, a Japanese Corporation, | |
| Defendants. | |

## PLAINTIFFS' CLASS ACTION COMPLAINT

Plaintiffs Steven Stone and Shirley Albright bring this action against Defendants Subaru of America, Inc. and Subaru Corporation (collectively, "Subaru"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

## I. INTRODUCTION

1.    This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a proposed class of past and present owners and lessees of the following model year ("MY") Subaru vehicles: MY2015-19 Outback; MY2015-19 WRX; MY2015-19 Forester; MY2015-19 Legacy; and MY2019 Ascent (collectively, the "Class Vehicles").

2.      The Class Vehicles suffer from one or more defects in materials and/or workmanship in that the electrical system within Class Vehicles suffers from a defect that subjects vehicle batteries and charging systems to a continuous parasitic drain. As a result, the batteries equipped therein are incapable of powering Vehicles for the times and mileages that consumers reasonably expect—due to the continuous parasitic drain—predisposing Class Vehicles to sudden and unexpected battery failure and premature battery replacement ("Electrical Defect" or "Defect").

3.      As further detailed below, the Electrical Defect—which existed at the time each Class Vehicle was manufactured and sold—typically manifests during the warranty period, or shortly after it has expired.

4.      Unfortunately, even when Class Vehicle owners present their vehicles for repair during the warranty period, Subaru informs them that the Defect does not exist and the battery simply needs to be recharged in an effort to evade its warranty obligations. Subaru's warranty practices thus invariably force Plaintiffs and Class members to pay out of pocket for premature battery replacement, regardless of whether Class Vehicles still were under warranty when the Electrical Defect first manifested.

5.      Subaru learned of the Defect at least as early as 2015, just before or shortly after bringing Class Vehicles to market, through the numerous complaints

it received from customers, information from dealers, National Highway Traffic

Safety Administration ("NHTSA") complaints, and its own internal records,

including pre-sale durability testing and quality assurance practices.

6.      Indeed, in February 2015 Subaru issued the first of several Technical

Service Bulletins ("TSB") concerning the Defect. In that first TSB, Subaru advised

its authorized dealers and service technicians of reports that customers were unable

to start Class Vehicles, and that instrument panel clusters and HVAC systems often

became inoperable following brief drives, all symptoms of the Defect. Subaru

thereafter issued at least eight (8) additional TSBs in an effort to remedy this

pervasive Defect. Yet, each "fix" has proven ineffective; in order to ensure Class

Vehicles function as warranted and expected, Plaintiffs and Class members

typically have no choice but to pay out of pocket to update vehicle software *and*

upgrade to batteries with significantly larger capacities.

7.      Despite its longstanding knowledge of this known, material defect,

Subaru failed to disclose the Electrical Defect to Plaintiffs and similarly situated

consumers, at the point of sale or otherwise.

8.      Not only did Subaru actively conceal that Class Vehicles' electrical

systems suffer from a defect in manufacturing and/or workmanship in that a

continuous parasitic drain exists and causes original equipment manufacturer

(OEM) batteries to fail prematurely, it also did not reveal that the existence of the

Electrical Defect would diminish the intrinsic and resale value of the Class Vehicles and cause consumers to incur an additional out-of-pocket expense to replace the OEM batteries in their Class Vehicles on a more frequent basis than consumers expect or should be required.

9.      Despite notice and knowledge of the Electrical Defect, Subaru has failed to (1) recall Class Vehicles to repair the Defect, (2) offer its customers suitable repairs, electrical system repairs and/or battery replacements free of charge, or (3) offer to reimburse its customers who have incurred out-of-pocket expenses to replace batteries or repair their electrical systems due to the Defect.

10.     Subaru's conduct in marketing and selling the Class Vehicles is in breach of its warranties and in violation of state law. Subaru has and will continue to benefit from its unlawful conduct—by selling more vehicles, at a higher price, and by avoiding its warranty obligations—while harming consumers at both the point of sale and as the batteries in their vehicles begin to fail. Had Plaintiffs and other Class members known about the latent Electrical Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them.

11.     To remedy Subaru's unlawful conduct, Plaintiffs, on behalf of themselves and Class members, seek damages and restitution from Subaru, including but not limited to reimbursement for all expenses already incurred

- 4 -

because of the Defect, including free battery replacements, repairs, diagnostics, and incidental costs (such as towing charges, vehicle rentals, etc.), as well as notification to Class members about the latent Electrical Defect.

## II. JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class members;[1] (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, Defendants have advertised in this district and have received substantial revenue and profits from selling and leasing the Class Vehicles in this district; therefore, a substantial part of the events and omissions giving rise to the claims herein occurred within this district.

14.     This Court has personal jurisdiction over Defendants because they

---

[1] http://carsalesbase.com/us-car-sales-data/subaru/ (and data contained therein for 2016 through 2019 Subaru Ascent, Outback, Forester and Legacy vehicles) (last visited Mar. 10, 2020).

have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within New Jersey and throughout the United States.

### III. <u>THE PARTIES</u>

#### A.    <u>Plaintiff Steven Stone</u>

15.    Plaintiff Steven Stone is a citizen of Florida, and currently resides in Citrus County.

16.    On September 15, 2016, Plaintiff Stone purchased a 2017 Subaru Outback from Volvo Subaru of Ocala, an authorized Subaru dealer located in Ocala, Florida.

17.    Plaintiff Stone's Class Vehicle bears Vehicle Identification Number 4S4BSANCXH3233739 and is registered in Florida.

18.    Prior to purchasing his Class Vehicle, Plaintiff Stone test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with Subaru sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise. Plaintiff Stone relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

19.    In addition to touting many of the Class Vehicle's safety features, the

vehicle's window sticker also stated that the vehicle was covered by Subaru's New Vehicle Limited Warranty. The New Vehicle Limited Warranty and the Class Vehicle's battery were central to Plaintiff Stone's purchasing decision. Plaintiff knew prior to purchasing his Class Vehicle that modern vehicles require a durable and dependable battery in order to provide safe and reliable transportation, and elected to purchase his Class Vehicle because of the extensive warranty coverage he reasonably expected Subaru to provide.

20.    On approximately May 10, 2017, the battery in Plaintiff's Class Vehicle failed. Plaintiff took his Class Vehicle to Volvo Subaru of Ocala and received a free replacement battery.

21.    In approximately June of 2018, the battery in Plaintiff's Class Vehicle failed again. Plaintiff was traveling and needed his vehicle repaired immediately in order to complete his voyage, and thus was unable to bring his vehicle to a Subaru dealership for repairs. Plaintiff had no choice but to purchase a new battery from a third-party retailer.

22.    Immediately after paying to replace the battery, he contacted Volvo Subaru of Ocala for reimbursement, but his request was denied despite the fact that his vehicle was still within Subaru's NVLW period. The service manager informed Plaintiff that there were no issues with the battery in the Class Vehicles and that neither the dealership nor Subaru's corporate office would assist Plaintiff in the

future if the battery (and replacement batteries) continued to fail.

23.     In approximately October of 2019, the battery in Plaintiff's Class Vehicle failed again. Plaintiff once again paid out-of-pocket for a replacement battery, totaling $167.53.

24.     Currently, Plaintiff takes his Class Vehicle to Scally's Lube & Go, an independent repair facility located in Dunnellon, Florida, for frequent charging, but it is Plaintiff's belief that the battery is failing to hold a charge and that it will fail again shortly.

25.     Although his Class Vehicle currently functions, due to the Defect's pervasive nature and the fact that Subaru's recommended repairs remedy the Defect only temporarily, Plaintiff cannot be confident that this most recent repair will permanently resolve the Defect.

26.     Had Subaru disclosed the Electrical Defect to him prior to purchasing a Class Vehicle, Plaintiff Stone would not have purchased his vehicle and would have avoided the extensive repair costs associated therewith.

**B.     Plaintiff Shirley Albright**

27.     Plaintiff Shirley Albright is a citizen of New York, and currently resides in Rensselaer County.

28.     In 2015, Plaintiff resided in New Jersey, and purchased a new 2016 Subaru Outback from Fred Beans Subaru, an authorized Subaru dealer located in

Doylestown, Pennsylvania.

29.    Plaintiff Albright purchased her Subaru vehicle for personal, family, or household use. Her vehicle bears Vehicle Identification Number 4S4BSANC2G3205903.

30.    When Plaintiff Albright purchased her Class Vehicle, she also purchased an extended warranty known as a "Gold Plus Warranty."

31.    Prior to purchasing her Class Vehicle, Plaintiff Albright test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with Subaru sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Albright of the Defect's existence at any time either prior to or following her purchase, whether at the point of sale or otherwise. Plaintiff Albright relied on Defendants' misrepresentations and omissions in deciding to purchase her vehicle.

32.    In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also stated that the vehicle was covered by Subaru's New Vehicle Limited Warranty. The New Vehicle Limited and Gold Plus Warranties, as well as the Class Vehicle's battery, were central to Plaintiff Albright's purchasing decision. Plaintiff Albright knew prior to purchasing her Class Vehicle that modern vehicles require a durable and dependable battery in order to provide safe and reliable transportation, and elected to purchase her Class Vehicle because of the

extensive warranty coverage she reasonably expected Subaru to provide.

33.    In approximately early October of 2018, the battery in Plaintiff Albright's Class Vehicle failed after it had been parked for 30 minutes. Plaintiff Albright called her third-party roadside assistance service and received a jump start, which enabled her to drive the vehicle. She was advised to drive the vehicle for at least an hour to recharge the battery fully. She did so before returning to her home in Troy, NY.

34.    The next morning, the battery in Plaintiff Albright's Class Vehicle failed yet again. Again, she called her third-party roadside assistance service and had her Class Vehicle towed to Carbone Subaru in Troy, New York, an authorized Subaru dealership. Carbone Subaru tested and recharged her Class Vehicles' battery, which took several hours, during which Plaintiff was forced to wait at the dealership. Carbone Subaru informed Plaintiff that there were no issues with her battery.

35.    In approximately January 2019, the battery in Plaintiff Albright's Class Vehicle failed a third time while she was out walking her dog in freezing temperatures, which required her to again use a third-party service to jump start her Class Vehicle. Plaintiff dropped her dog off at home and immediately drove to Carbone Subaru. After performing another battery test, Carbone Subaru advised Plaintiff Albright that the battery needed to be replaced, but that Subaru would not

cover the repair pursuant to either her NVLW or Gold Plus warranty.

36.    Plaintiff Albright asked that Carbone Subaru install a high-capacity, 500 CCA replacement battery in an effort to mitigate the Defect and avoid being stranded again in the future.

37.    Plaintiff Albright paid Carbone Subaru approximately $176.74 for a new 540 CCA battery.

38.    Had Subaru disclosed the Electrical Defect to her prior to purchasing a Class Vehicle, Plaintiff Albright would not have purchased her vehicle and would have avoided the extensive repair costs associated therewith.

C.    **Defendants**

39.    Defendant Subaru Corporation ("SC"), formerly known as Fuji Heavy Industries Ltd.,[2] is a Japanese corporation located at Ebisu Subaru Building, 1-20-8, Ebisu, Shibuya-ku, Tokyo 150-8554.  SC is responsible for the design, production, distribution, marketing, sale, and serving of Subaru vehicles, including the Class Vehicles, around the world, including in the United States.

40.    Defendant Subaru of America, Inc. ("SOA") is a New Jersey corporation with its principal place of business located at One Subaru Drive, Camden, New Jersey 08103.

41.    SOA is the wholly-owned U.S. sales and marketing subsidiary of SC,

---

[2] https://www.subaru.co.jp/en/ir/library/pdf/ar/ar_2019e_01.pdf at p. 05 (last accessed Mar. 10, 2020).

and it distributes, markets, sells, and services Subaru vehicles in the United States.

42.    There exists, and at all times herein existed, a unity of ownership between SC, SOA and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others. Adherence to the fiction of the separate existence of Defendants, would, under the circumstances set forth in this amended complaint, sanction fraud or promote injustice.

43.    For example, upon information and belief, SOA communicates with SC concerning virtually all aspects of the Subaru products SOA distributes within the United States, including appropriate repairs for pervasive defects, and whether Subaru will cover repairs to defective parts and assemblies. Subaru's decision not to disclose the Defect to Plaintiffs or the Class, or to cover repairs to the same pursuant to an extended warranty or goodwill program, was a decision made jointly by SC and SOA.

44.    SC and SOA also jointly develop owner's manuals, warranty booklets, and maintenance recommendations and schedules for the Class Vehicles, as well as Technical Service Bulletins Subaru issues to authorized dealerships in order to address known defects, including the Defect at issue in this action.

45.    SC and SOA also jointly design, determine the substance of, and affix to Subaru vehicles the window stickers visible on every new Subaru vehicle

- 12 -

offered for sale at their authorized dealerships, including those omitting mention of the Electrical Defect and reviewed by Plaintiffs and the Class prior to purchasing Class Vehicles. Subaru controls the content of these window stickers; its authorized dealerships have no input with respect to their content. Vehicle manufacturers like Subaru are legally required to affix a window sticker to every vehicle offered for sale in the United States pursuant to the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231-1233, *et seq*. In fact, the Act specifically prohibits the removal or alteration of the sticker by anyone other than the ultimate purchaser prior to the sale of the car, including the dealership at which the vehicle is offered for sale.

## IV. <u>NEW JERSEY LAW APPLIES</u>

46.    It is appropriate to apply New Jersey law to the nationwide claims because New Jersey's interest in this litigation exceeds that of any other state.

47.    New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution. New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

48.    As discussed above, Defendant Subaru of America, Inc. is headquartered in Camden, New Jersey and is the sole entity in the contiguous 48 U.S. states responsible for distributing, selling, leasing and warranting Subaru vehicles.

49.    Defendants own property and conduct substantial business in New Jersey and, therefore, New Jersey has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in New Jersey and avail themselves of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

50.    Specifically, SOA opened a new headquarters in Camden, New Jersey in 2018, which occupies a $118 million, 250,000 square-foot structure that serves as the company's national headquarters, bringing its more than 550 employees from four sites onto one campus.[3] From 1986 until 2018, SOA had its principal place of business located in Cherry Hill, New Jersey.

51.    Upon information and belief, Subaru's customer relations, technical training center, engineering, marketing, and warranty departments are all located in SOA's Camden, New Jersey campus, and from 1986 until 2018 were located at SOA's Cherry Hill New Jersey campus. SOA's customer relations department is

---

[3] http://media.subaru.com/pressrelease/1272/239/subaru-america-celebrates-new-headquarters-camden-nj-grand (last visited Mar. 10, 2020).

responsible for fielding customer complaints and monitoring customer complaints posted to Subaru or third-party websites. SOA's warranty and engineering departments are both responsible for the decisions to conceal the Electrical Defect from Subaru's customers, and for instituting a policy to systematically deny warranty coverage to those who experienced the Defect.

52.     Based on the foregoing, the policies, practices, acts and omissions giving rise to this Action were developed in, and emanated from, SOA's headquarters in Cherry Hill and/or Camden, New Jersey. As detailed below, Subaru also came to know, or should have come to know, of the Electrical Defect through the activities of Subaru's divisions and affiliated entities located within New Jersey. Accordingly, the State of New Jersey has the most significant relationship to this litigation and its law should govern.

## V. <u>TOLLING OF STATUTES OF LIMITATION</u>

53.     Defendants' knowing and active concealment and denial of the facts alleged herein have tolled any applicable statutes of limitations. Plaintiffs and Class members could not have reasonably discovered the true, latently defective nature of the proposed Class Vehicles until shortly before this litigation commenced.

54.     In addition, even after Plaintiffs and Class members contacted Defendants and/or their authorized dealers for vehicle repairs or battery

replacement as a result of the Electrical Defect, Defendants, directly and/or

through their dealers, routinely informed their customers that Class Vehicles (and

the batteries within them) are not defective.

55.     Defendants were and remain under a continuing duty to disclose to

Plaintiffs and the members of the Class the true character, quality and nature of the

Class Vehicles, *i.e.* that the Class Vehicles' electrical system suffers from a defect

in manufacturing and/or workmanship in that a continuous parasitic drain exists

and causes OEM batteries to fail prematurely, and that the existence of the

Electrical Defect diminishes the intrinsic and resale value of the Class Vehicles

and costs consumers an increased expense to replace the OEM batteries in their

Class Vehicles on a more frequent basis than should be required. As a result of

Defendants' active concealment of the Defect, any and all applicable statutes of

limitations otherwise applicable to the allegations herein have been tolled.

## VI. FACTUAL ALLEGATIONS

**A.     The Electrical Defect within the Class Vehicles.**

56.     The Class Vehicles represent Subaru's most popular offerings. On

information and belief, Subaru has sold more than 2 million Class Vehicles, which

consist of the Subaru Legacy, a mid-size Sedan; the Subaru Outback, a station

wagon; the Subaru Forester, an SUV; the WRX, a high-performance rally vehicle; and the Subaru Ascent, an SUV and the largest automobile Subaru manufactures.

57.    Subaru has and continues to market its company as producing quality vehicles, and asserts that the first tenet of its corporate philosophy is that it "strive[s] to create advanced technology on an ongoing basis and provide consumers with distinctive products with the highest level of quality and customer satisfaction."[4]

58.    As explained above, the Class Vehicles suffer from one more defects in materials and/or workmanship in that the electrical system within the Class Vehicles suffers from a defect that subjects vehicle batteries and charging systems to a continuous parasitic drain. The batteries equipped therein are incorrectly sized due to the continuous parasitic drain—since they are too small to power the Vehicles for the times and mileages that consumers reasonably expect— predisposing Class Vehicles to sudden and unexpected battery failure and premature battery replacement.

59.    Below is a chart showing the capacities of the OEM batteries Subaru equipped within the Class Vehicles:

| Battery Type | Battery Capacity | MY & Model |
|---|---|---|
| 75D23L | 12V-62AH | 2019MY Ascent |
| | | 2018MY Forester |
| | | 2018-19 WRX |

[4] https://www.subaru.co.jp/en/ir/library/pdf/ar/ar_2019e.pdf at p. 02 (last visited Mar. 10, 2020).

| 75D23R | 12V-52AH | 2018-19MY Outback |
|--------|----------|-------------------|
|        |          | 2018MY Outback |
|        |          | 2015-16MY Outback (3.6L models) |
|        |          | 2017 MY Legacy (3.6L models) |
|        |          | 2018-19MY Legacy |
|        |          | 2015-16MY Legacy (3.6L models) |
| 55D23R | 12V-48AH | 2015-17MY Outback (2.5L models) |
|        |          | 2016MY Outback (2.5L models) |
|        |          | 2015MY Outback (2.5L models) |
|        |          | 2015-17MY Legacy (2.5L models) |
|        |          | 2016MY Legacy (2.5L models) |
|        |          | 2015MY Legacy (2.5L models) |
| 55D23L | 12V-48AH | 2015-17MY Forester |
|        |          | 2015-17 WRX |
| Q85    | 12V-40AH | 2019MY Forester |

60.     The Amp Hour (AH) specification related to battery capacity provides a measurement of the charge that can be delivered by the battery. The standard rating is an amp rating taken over a period of 20 hours. By way of example, a 100 AH rated battery will provide approximately 5 amps per hour of charge for a period of 20 hours. Importantly, the total time of discharge and load applied is not a linear relationship. As the load on the battery increases, the realized capacity thereby decreases.

61.     The batteries contained in the Class Vehicles have amp hour ratings between 40 and 62 AH. Therefore, using the standard 20 hour rating as described above, a 40 AH rated battery would be able to deliver approximately 2 amps per hour of charge for 20 hours while the 62 AH rated battery would be able to deliver 3.2 amps of power for 20 hours.

62.     As described above, the Class Vehicles have a constant parasitic drain on the batteries, including when the vehicles are turned off and parked. When the engines are not running, the batteries are not being replenished by the charging system. Therefore, any drain on the batteries at this time is being powered solely by the stored charge contained within the batteries.

63.     As described above, and upon information and belief, the Class

Vehicles have a continuous parasitic drain of approximately 3 to 4 amps.

Therefore, a 40 AH rated battery would be able to deliver 3.5 amps per hour of

charge for only 11.4 hours while the 62 AH rated battery would be able to deliver

3.5 amps of power for 17.7 hours. This means that if the vehicle were not started

and batteries charged within these time periods (11.4 to 17.7 hours) then the

batteries would completely drain, potentially leaving Class members stranded.

64.     Furthermore, the batteries contained in the Class Vehicles are a lead-

acid storage design that converts chemical energy into electrical energy. When the

battery is placed under a load, the device converts stored chemicals into electricity,

and the current flows through the wires to its destination.

65.     The lead-acid battery is comprised of cells in which each cell contains

electrolytes and plates. An electrolyte is an ionized bath — typically, sulfuric acid

($H_2SO_4$) diluted with water — that generates an electrical current when needed.

Each cell also contains plates (grids of active material), which are both positive

and negative. Typically, the positive plates contain lead dioxide ($PbO_2$), while the

negative plates are composed of straight lead (Pb).

66.    Over time, battery capacity degrades due to sulfation of the battery and shedding of active material. The degradation of battery capacity depends most strongly on the interrelationship between the charging/discharging regime which the battery has experienced.  Therefore, a constant low or dead battery caused by excessive parasitic drain – as in the Class Vehicles - will also dramatically shorten battery life. This can also result in a decreased AH and, thereby, a decrease in the time period within which the batteries will become completely drained.

67.    As explained below, Defendants knew or should have known about the Electrical Defect and its consequences since at least 2015, before Class Vehicles were even made available for purchase.

68.    Subaru's failure to properly rectify the Electrical Defect within the Class Vehicles amplifies the shortcomings inherent in its electrical system and OEM batteries. Since February 2015, Subaru has issued nine (9) separate TSBs aimed at improving battery life by, *inter alia*, replacing purportedly defective fuses, relays and battery sensors, and/or reprogramming electronic control modules ("ECM") to optimize battery charging and minimize drainage.

69.    Unfortunately for consumers, each of Subaru's purported "fixes" has proven inadequate. Class members continue to report premature battery failure at low mileages, typically within or just outside the warranty period.

**B.    <u>Subaru's Longstanding Knowledge of the Defect</u>**

a.    **Internal Data**

70.    Subaru is experienced in the design and manufacture of consumer vehicles, and thus knew, or should have known of, the Electrical Defect prior to placing Class Vehicles into the stream of commerce.

71.    For example, since November of 1994 Subaru has utilized an internal quality management system "to impress customers through the establishment of quality policy in line with our customer first policy and a high level of integration of safety, enjoyment and environmental performance."[5]

72.    Specifically, Subaru's Product Quality Management System focuses on four key metrics:

- Establish Quality Management System (QMS) based on the Quality Policy and ISO 9001 Standard and put it into practice for orderly and effective operations.
- Clarify the quality targets acceptable to customers at the planning stage.
- Realize the quality targets through quality assurance activities at each stage from development to sales and service.
- Attend to complaints and requests from the market quickly and appropriately to live up to the trust of customers.

73.    Using this system, Subaru "works to assure quality in each process from design and development through to sales as well as creating a cycle to create

---

[5] https://www.subaru.co.jp/en//csr/consumers/pdf/quality.pdf (last visited Mar. 10, 2020). The remaining citations in this section all refer to information found on this webpage.

even higher quality products. In addition, [Fuji Heavy Industries][6] strives to work through this cycle swiftly in order to meet customer needs without any delay."

74.     Subaru's quality management cycle consists of three stages. In the design and development stage, consideration is "given to preventing variability and standardization of tasks from the blueprint creation stage through to production processes."

75.     The production stage entails "[e]stablishment of process management aimed at preventing quality defects and variability as well as implementation of strict quality inspection and testing."

76.     The distribution and sales stage begins after vehicles are shipped and collects after-sales information and quality improvements that can be made. Subaru explicitly collects and analyzes "information on quality defects and requests sent to dealerships and SUBARU Customer Center."

77.     Subaru then takes the quality defect data and "promptly" implements in successive design and development stages.

78.     Finally, "[i]n the event of product defects, not only do we [Subaru] respond properly based on the laws and regulations of each country, but we also determine the specific details of our response by promptly establishing a

---

[6] *See* n. 2, *supra.*

committee structure for staff from departments involved in quality, including those outside of Japan, to investigate."

79.    Even if Subaru's robust quality management system somehow failed to detect the Electrical Defect, however, Subaru did learn, or should have learned of it, through other means.

80.    Subaru conducts extensive pre-release testing on batches of components, including batteries, ECMs, ECUs, and other electrical system components, to verify that parts are free from defects and comply with Subaru's specifications.[7] Given high frequency with which the Electrical Defect typically manifests, it is implausible that Subaru's preproduction testing would not have alerted Subaru to the existence of the Defect. Only Subaru, however, has access to its prerelease testing data.

81.    Subaru also receives data about how its vehicles are performing in the days, weeks, and months after they are sold. Subaru collects information from both drivers and dealerships, including through complaints, warranty claims, repair and

---

[7] Subaru's Quality Policy, established in 1994 and most recently revised in April 2019, provides that "At Subaru, quality is our highest priority as we earn the trust of our customers." The Policy continues:

1. We will deliver long lasting products that our customers can use with peace of mind.
2. We will continually improve our products and services by always listening closely to our customer's voice.
3. We will be a good corporate citizen in all markets where we do business by ensuring compliance with all internal rules, local laws, regulations and social norms.

https://www.subaru.co.jp/en/outline/vision.html (last visited Mar. 10, 2020).

replacement parts data, and other aggregated data sources. Subaru also has exclusive access to this information.

82.    Defendants' Quality Assurance Group interacts with Subaru-authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues. Subaru's Quality Assurance Group also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

83.    Defendants' National Warranty Department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles. Defendants dictate that when a repair is made or battery replaced under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the replaced battery in case Defendants later determine to audit the dealership or otherwise verify the appropriateness of its replacement. For their part, service centers are meticulous about providing Defendants with this detailed information

about in-warranty repairs, because Defendants will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

84.    Defendants were also aware of the high number of replacement batteries ordered due to the Electrical Defect, even before the Class Vehicles were initially sold or leased. All Subaru service centers are required to order replacement parts directly from Defendants. Other independent vehicle repair shops that service Class Vehicles also order replacement parts, including batteries, directly from Defendants. Defendants routinely monitor part sales reports, and Subaru has designated internal teams that are responsible for actually shipping parts requested by dealerships and technicians. Defendants thus have detailed, accurate, and real-time data regarding the number and frequency of replacement part orders, including batteries. The sudden increase in orders for replacement batteries used in the Class Vehicles, as well as similar Subaru models produced before the Class Vehicles, was known to Defendants, and should have alerted them to the scope and severity of the Electrical Defect.

85.    Indeed, Subaru's graphical representation of its "Quality Management Cycle"[8] demonstrates the manner in which Subaru continuously monitors the types

---

[8] https://www.subaru.co.jp/en/csr/quality.html (last visited Mar. 10, 2020).

of data identified above in order to track, identify and resolve issues like the

Electrical Defect:



### b. **Complaints by Other Class members.**

86.     Subaru's Customer Relations department routinely monitors the

internet for customer complaints and has retained the services of third-parties to do

the same. Further, the Customer Relations department regularly receives and

responds to driver calls concerning vehicle problems.

87.     Subaru also monitors drivers' safety-related reports to the National

Highway Transportation Safety Administration ("NHTSA"), which can be viewed

on NHTSA's website. Beginning in, at latest, early 2015, drivers of Class Vehicles

began contacting NHTSA to complain about the Electrical Defect.

88.     Indeed, many owners and lessees of the Class Vehicles have publicly

complained online, or to the Office of Defects Investigation (ODI) within NHTSA.

ODI conducts defect investigations and administers safety recalls to support the NHTSA's mission to improve safety on the nation's highways.

89.    Federal law requires automakers like Subaru to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

90.    Thus automakers should (and do) monitor NHTSA databases for consumer complaints regarding their automobiles as part of the automakers' ongoing obligation to identify potential defects in their vehicles, such as failures of vehicle electrical systems, including batteries.

91.    From its monitoring of the NHTSA databases, Subaru knew or should have known of the many complaints about the Electrical Defect submitted to

NHTSA ODI, and the content, consistency, and volume of those complaints

alerted, or should have alerted, Subaru to the Electrical Defect.

92.    The following are just a few examples of the complaints submitted to

ODI concerning the batteries and related issues with the Class Vehicles:

**Consumer No. 1:**
**Date Complaint Filed:** January 8, 2015
**Date of Incident:** January 8, 2015
**Component(s):** Electrical System
**NHTSA ID Number:** 10671119
**Consumer Location:** New Britain, CT
**Summary:** AFTER BEING PARKED OUTSIDE OVERNIGHT WITH
TEMPERATURES BELOW 0 DEGREES F, THE VEHICLE STARTED
FINE THE FOLLOWING MORNING BUT HAD NUMEROUS
WARNING LIGHTS ILLUMINATE (POWER STEERING, AT OIL
TEMPERATURE, AMONG OTHERS) WHILE IDLING IN MY
DRIVEWAY. VEHICLE WARMED UP FOR 5 MINUTES. ONCE
WARMED UP, OWNER TURNED THE VEHICLE OFF AND
ATTEMPTED TO RESTART 20 MINUTES LATER. VEHICLE WOULD
NOT RESTART BUT OTHER ELECTRICAL COMPONENTS (LIGHTS,
RADIO, ETC) WORKED BUT THE STARTER WOULD NOT ENGAGE.
VEHICLE TOWED TO DEALERSHIP FOR DIAGNOSIS OF WHAT
APPEARS TO BE AN ELECTRICAL PROBLEM. *TR

**Consumer No. 2:**
**Date Complaint Filed:** May 6, 2015
**Date of Incident:** May 2, 2015
**Component(s):** Electrical System
**NHTSA ID Number:** 10715057
**Consumer Location:** Andrews, TX
**Summary:** WE STOPPED TO HAVE LUNCH AND 30 MINUTES
LATER THE CAR BATTERY AS DEAD OR SO IT SEEMED AS IT
WOULDN'T TURN OVER. WE HAD TO CALL HIGHWAY SAFETY TO
COME AND HE JUMPED IT OFF. WE GOT SOME AN HOUR LATER
AND THEN WE WENT TO OUR SON'S HOUSE FOR ANOTHER HOUR
AND WHEN WE TRIED TO START IT AGAIN IT WAS DEAD. OUR

SON SORTA ROCKED THE CAR FROM SIDE TO SIDE AND THEN IT WOULD CRANK.

ON OUR WY HOME WE STOPPED AT THE GROCERY STORE AND GOT MILK AND THEN IT WAS DEAD AGAIN. A MAN JUMPED IT OFF AGAIN. NEXT DAY AS WE WERE TAKING THE CAR TO OUR SUBARU DEALER IT STARTED RIGHT UP. STILL WE TOOK IT ON IN TO OUR MIDLAND, TX DEALER AND THEY COULD FIND NOTHING WRONG! WE ARE ELDERLY 87 AND 83 AND CAN'T TAKE MUCH MORE OF THIS KIND OF TROUBLE. (NOTHING IS WRONG) WE SAT 3 HOURS IN THE SUN ON SAT AS WE WAITED FOR ROAD SIDE SERVICE. PLEASE HELP. *TR

**Consumer No. 3:**
**Date Complaint Filed:** August 31, 2015
**Date of Incident:** July 17, 2015
**Component(s):** Electrical System
**NHTSA ID Number:** 10760335
**Consumer Location:** Cambridge, MA
**Summary:** THIS IS NOT EXACTLY A SAFETY PROBLEM, BUT COULD BE A CRITICAL ISSUE. WE LEFT THE BRAND NEW SUBARU 1015 FORESTER FOR TWO WEEKS WHILE WE WERE ON VACATION. WHEN WE CAME BACK THE BATTERY WAS DEAD. AAA TECH TOLD US THIS IS NOT AN UNCOMMON PROBLEM IN 2015 CARS WITH FULL COMPLEMENT OF FEATURES, AND TYPING "SUBARU BATTERY DRAINAGE PROBLEM" INTO GOOGLE BRINGS UP A LITANY OF COMPLAINTS. APPARENTLY ALL THE ELECTRONICS IN THE CAR DRAIN THE BATTERY EVEN WHEN THE CAR ISN'T RUNNING. SUBARU IMPLIED IT WAS OUR FAULT FOR NOT STARTING THE CAR. THAT'S ABSURD. WE HAVE A 2010 HONDA CIVIC THAT WAS UNDER THE SNOW FOR 6 WKS. AND IT STARTED RIGHT UP. SUBARU CHECKED OUR BATTERY, PRONOUNCED IT HEALTHY, SUGGESTED WE BUY A TRICKLE CHARGER (WHICH WE HAVE DONE), AND SENT US $100 FOR OUR LOYALTY. NOWHERE IN THE SUBARU LITERATURE DOES IT SAY THAT THE CAR MUST BE STARTED EVERY FEW DAYS OR WARN ABOUT BATTERY DRAINAGE. IF WE'D HAD AN EMERGENCY THAT REQUIRED US TO USE THE CAR WHEN WE FIRST GOT HOME, WE'D HAVE BEEN POUT OF LUCK. THIS TECHNOLOGY IS

NOT READY FOR PRIME TIME, AND AT THE VERY LEAST
CONSUMERS SHOULD BE WARNED.

**Consumer No. 4:**
**Date Complaint Filed:** April 4, 2016
**Date of Incident:** April 4, 2016
**Component(s):** Electrical System
**NHTSA ID Number:** 10853245
**Consumer Location:** Evergreen, CO
**Summary:** FORESTER SAT FOR 2 WEEKS AND BATTERY WAS
DRAINED COMPLETELY THOUGH NO LIGHTS OR ACCESSORIES
WERE LEFT ON. RECHARGED BATTERY, DROVE IT FOR TWO
DAYS THEN CAR SAT FOR TWO DAYS. AGAIN BATTERY WAS.
COMPLETELY DEAD. VERY DISAPPOINTED AND CONCERNED
OVER LACK OF RELIABILITY

**Consumer No. 5:**
**Date Complaint Filed:** July 8, 2016
**Date of Incident:** June 23, 2016
**Component(s):** Electrical System
**NHTSA ID Number:** 10883494
**Consumer Location:** Carmel, IN
**Summary:** AFTER BEING PARKED AND UNUSED FOR AS FEW AS 3
DAYS, THE BATTERY DRAINS AND THE CAR WILL NOT START.
THIS HAS HAPPENED ON TWO OCCASIONS. SEVERAL OTHER
OWNERS OF 4 CYLINDER 2015 OUTBACKS HAVE REPORTED THIS
ISSUE AT HTTP://WWW.SUBARUOUTBACK.ORG/FORUMS/138-
GEN-5-2015-PRESENT/344506-DEAD-BATTERY-2016-A.HTML

**Consumer No. 6:**
**Date Complaint Filed:** September 22, 2017
**Date of Incident:** September 21, 2017
**Component(s):** Electrical System
**NHTSA ID Number:** 11025029
**Consumer Location:** Syracuse, UT
**Summary:** PURCHASED IN AUGUST 2014. YESTERDAY I PUT THE
3RD BATTERY IN THE CAR. THIS SEEMS EXCESSIVE AND MAY
INDICATE A PROBLEM WITH DRAW ON THE BATTERY DURING
DOWN-TIME. CHARGING SYSTEM CHECKS FINE AND ALSO

CHECKED FINE AT THE POINT OF REPLACING THE BATTERY THE
OTHER TIMES.

**Consumer No. 7:**
**Date Complaint Filed:** October 26, 2017
**Date of Incident:** October 23, 2017
**Component(s):** Electrical System
**NHTSA ID Number:** 11040055
**Consumer Location:** Unknown
**Summary:** 7,180 MILEAGE, PURCHASED NEW 12-2016. GARAGED
KEPT, 80 DEGREE TEMP.

WE BOTH ARE 70 + YEARS, SAFETY RELIABILITY ARE MAJOR
CONSIDERATIONS. ON 10-21-17, WE MADE A 20 MILE GROCERY
TRIP. AUTO DROVE AS USUAL. ON 10-23-17, WE HAD M.D.
APPOINTMENT. STARTER WOULDN'T TURN MOTOR OVER.
ORIGINAL BATTERY CAME WITH THE CAR, HAD ZERO
ELECTRICAL ENERGY LEFT...I CONNECTED MY BATTERY
CHARGER TO THE BATTERY POSTS, WAITED 10 MINUTES. DASH
LIGHTS CAME ON, MOTOR STILL WOULDN'T TURN OVER.

CHARGED BATTERY AN ADDITIONAL 30 MINUTES, AND
SWITCHED CHARGER MODE TO 50 AMP 'START' MODE, STARTER
MOTOR SLOWLY TURNED, AND MOTOR STARTED. MADE THE 60

MILE TRIP TO M.D'S OFFICE, AND BACK HOME, AND WHEN
ARRIVING HOME, FOUND OUT THAT

THE PASSENGER NOR DRIVER'S ELECTRIC WINDOW WOULDN'T
OPEN, TO GET MAIL FROM OUR MAIL BOX.

ON 11/26/17 I TOOK THE CAR TO SUBARU OF JACKSONVILLE.
THREE HOUR WAIT AT DEALER, EVEN WITH AN APPOINTMENT.
THE WARRANTY REPAIR WAS LISTED AS ECM UPDATE.

DEALER'S WORK ORDER COPY RE. WINDOWS WAS " ALL SYSTEMS OPERATING AS DESIGNED."

SERVICE DEPARTMENT MENTIONED THAT THERE MAY BE AN ADDITIONAL UPDATE REQUIRED.

WITH OUR LAST COUPLE OF G.M. CARS, VARIOUS "UPDATES OR ADJUSTMENTS" WERE MADE

VIA SATELLITE.

THIS TECHNOLOGY IS CERTAINLY AVAILABLE...WITH BLUETOOTH PERHAPS, THROUGH CELL PHONE ?

I MADE THE 30+ MILE TRIP FROM THE DEALER HOME TO ST. AUGUSTINE WITHOUT FURTHER PROBLEMS.

**Consumer No. 8:**
**Date Complaint Filed:** May 29, 2018
**Date of Incident:** May 25, 2018
**Component(s):** Electrical System
**NHTSA ID Number:** 11098426
**Consumer Location:** Cromwell, CT
**Summary:** I HAVE A TOTAL OF ELECTRICAL POWER LOST FOR 7 TIMES. 2 TIMES WHILE DRIVING I EXPERIENCE ALL ELECTRICAL LOST WHILE DRIVING ON THE HIGHWAY. I WAS ABLE TO PULL OVER TO THE SIDE AND WAS ABLE TO JUMP STARTED THE CAR WITH A JUMPER BATTERY 5 MINUTES LATER. OTHER 5 TIMES IT HAPPENED WHEN I TRY TO START THE CAR AND I DID NOT GET ANY ELECTRICAL POWER AT ALL. I TOOK THE CAR TO THE DEALER TWICE AND THEY CHANGE/FIX THE CAR GROUND THE FIRST TIME THAT I LOST ELECTRICAL POWER. THEN THEY CHANGE THE BATTERY AFTER 5 ELECTRICAL POWER FAILURES. I AM ABOUT TO BRING IT IN FOR THE 7TH TIME FOR THEM TO LOOK AT IT. I AM TOTALLY LOST CONFIDENT AND NO LONGER

FEEL COMFORTABLE OR FEEL SAFE DRIVING MY TWO BOYS ON THIS CAR.

**Consumer No. 9:**
**Date Complaint Filed:** June 4, 2019
**Date of Incident:** April 1, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11217905
**Consumer Location:** Traverse City, MI
**Summary:** I ATTEMPTED TO START MY SUBARU ASCENT AND IT WOULD NOT START. I CONTACTED SUBARU'S TOWING AND THEY CAME AND JUMPSTARTED THE CAR. THE TOWING COMPANY INFORMED ME THAT SUBARU'S ASCENT BATTERIES ARE DEFECTIVE AND THAT THEY HAVE BEEN FORCED TO JUMP A NUMBER OF THEM. I DROVE TO WORK. THE NEXT MORNING, I WOKE TO THE SAME PROBLEM. I CALLED SUBARU'S TOWING SERVICE, AND THEY CAME OUT AGAIN. I TOOK THE CAR TO THE DEALERSHIP AND THEY TESTED THE BATTERY, BUT THE BATTERY DID NOT EXHIBIT FAIL CODES. SUBARU WOULD NOT REPLACE THE BATTERY, DESPITE THE TWO FAILURES. SINCE THIS TIME, I'VE HAD MULTIPLE BATTERY FAILURES AND SUBARU CONTINUES TO DENY MY REQUEST FOR REPLACEMENT.

**Consumer No. 10:**
**Date Complaint Filed:** August 28, 2019
**Date of Incident:** August 24, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11252033
**Consumer Location:** Limerick, PA
**Summary:** MY VEHICLE, WHILE STATIONARY WITHOUT ANYTHING PLUGGED IN OR RUNNING (I.E. AC), HAS THE BATTERY DIE. THE VEHICLE IS A 2018, AND THIS HAPPENED 08/24/2019. I BELIEVE A BATTERY TO BE A MAINTENANCE ITEM, BUT BEING LESS THEN 2 YEARS OLD UNDER "NORMAL" USE IS CONTRARY TO INDUSTRY OR MANUFACTURER STANDARDS, WHICH I BELIEVE THE UNEXPECTED TIMING AND NATURE CREATES A SAFETY ISSUE. I REPLACED THE BATTERY, AND FOUND THIS TO BE A COMMON ISSUE WITH SUBARU'S;

HOWEVER, NEVER RECEIVED ANY ADVISEMENT OR
NOTIFICATION FROM THE COMPANY.

**Consumer No. 11:**
**Date Complaint Filed:** September 8, 2019
**Date of Incident**: June 21, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11254012
**Consumer Location:** Portland, OR
**Summary:**  OUR ASCENT HAS BEEN DYING SINCE JUNE, WHICH
WAS ALMOST A YEAR FROM THE DAY WE BOUGHT IT BRAND
NEW (FIRST ASCENT SOLD BY OUR DEALER). IT HAS LOST
TOTAL POWER ABOUT 7-8 TIMES NOW AND WE'VE HAD IT
TOWED TO OUR SUBARU DEALER THREE TIMES. THE FIRST
TIME THEY SAID IT WAS A DEFECTIVE BATTERY AND GAVE US
A NEW BATTERY. THE SECOND TIME THE DEALER PERSON SAID
THERE WAS NO PROBLEM AND BLAMED ME FOR LEAVING ONE
OF THE INTERIOR LIGHTS ON OVERNIGHT THUS DRAINING THE
BATTERY. THE THIRD TIME THEY KEPT THE CAR FOR ABOUT A
WEEK AND AFTER THAT THEY SAID IT WAS SOME SORT OF A
LOOSE CABLE AND THAT THEY HAD FIXED THE PROBLEM.
SINCE THEN THE CAR HAS DIED TWO MORE TIMES. THE FIRST
ONE WHEN MY HUSBAND WAS CAMPING WITH THE KIDS
(WHICH HAS HAPPENED BEFORE WHILE CAMPING BECAUSE OF
THE OPENING AND CLOSING OF DOORS) BUT LUCKILY HE HAD
A "JUMP STARTER KIT" WHICH WE HAD ACQUIRED AFTER FEW
TIMES AFTER OUR CAR DIED. AND, THAT I MUST ADD THAT IT IS
A TOOL THAT SHOULD COME WITH EVERY ASCENT! THE LAST
TIME WAS TODAY. PROBABLY BECAUSE THE KIDS LEFT ONE
INTERIOR LIGHT ON AGAIN. THEY KEEP CLAIMING IT'S MY
FAULT FOR LEAVING THE INTERIOR LIGHT ON OVERNIGHT,
AND THAT THE SUBARU TECHNOLOGY REPORTING SYSTEM
HAS NOTHING ABOUT THIS. ISN'T THIS AN ABSURD?
UNACCEPTABLE THAT A SMALL LITTLE LIGHT CAN DRAIN THE
ENTIRE BATTERY POWER ONLY OVERNIGHT. I AM NOT
TALKING ABOUT HEADLIGHTS ON OVERNIGHT, IT'S ONLY ONE
INTERIOR LIGHT... AND SOMETIMES NOT EVEN THAT, JUST THE
FACT THAT WE OPENED AND CLOSED THE DOORS WAY TOO

MANY TIMES (EG WHILE CAMPING). THIS IS VERY IRRITATING AND I THINK THEY SHOULD HAVE THIS FIXED.

**Consumer No. 12:**
**Date Complaint Filed:** September 11, 2019
**Date of Incident:** September 10, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11254696
**Consumer Location:** Tigard, OR
**Summary:**  BATTERY DEAD SEVERAL TIMES. HAVE HAD TO HAVE IT JUMPED SIX TIMES. BATTERY REPLACED BY DEALER ONCE. I NOTE THAT MANY SUBARU OWNERS HAVE SIMILAR PROBLEM.

**Consumer No. 13:**
**Date Complaint Filed:** September 29, 2019
**Date of Incident:** September 28, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11258886
**Consumer Location:** Oakland, CA
**Summary:** I WAS DRIVING MY FORRESTER 2019, NOTICE THAT IT WOULD SLOWLY MOVE ONCE I STOPPED AT A STOP SIGN. BUT THEN IT WOULD JERK INTO A FASTER PACE. YESTERDAY AS I WAS DRIVING, I STOP AT A BANK ATM. WHEN I WENT BACK TO THE VEHICLE I PUT MY KEY IN THE IGNITION AND NOTHING HAPPENED. NOT A SOUND. SO TRIED IT SEVERAL MORE TIMES WITH THE SAME RESULTS. I HAD TO CALL FOR ROADSIDE SERVICE. THEY CAME AND GAVE ME A JUMP. THE VEHICLE STARTED WITH NO PROBLEM. I DID AS THE SERVICE PERSON TOLD ME TO LET THE VEHICLE RUN FOR AT LEAST 30 MINUTES SO THE CELLS CAN BUILD UP IN THE BATTERY, SO I DID AS I WAS TOLD. AS I WOULD TURN THE CORNERS ON THE STREETS- THE STEERING BECAME VERY DIFFICULT, (IN BOTH DIRECTIONS). ESPECIALLY AFTER TURNING AT A STOP SIGN, SO AS I WERE DRIVING I NOTICE THE DASH BOARD WOULD KEEP BLINKING. I TOOK A PHOTO OF THE GAGES ON THE DASHBOARD. THE EYESIGHT LIGHT STAYED, BUT THE OTHERS KEPT BLINKING OFF AND ON. I DROVE THE VEHICLE HOME AND TRIED TO PARALLEL PARK IN FRONT OF MY HOUSE BUT THE WHEELS WOULD NOT ALLOW ME TO DO SO. SO I PARKED THE

CAR ACROSS THE STREET WHERE THEIR WERE A LOT MORE
SPACE AND I PARKED THERE. I SET THERE FOR ANOTHER 30
MINUTE BEFORE TURNING OFF THE ENGINE. ONCE I TURNED
THE ENGINE OFF AND TRIED TO START THE ENGINE AGAIN IT
FELL TO TURN OVER. NO SOUND OR ANYTHING JUST LIKE
EARLIER. IN 2018 THEY REPLACE MY BATTERY, BECAUSE I WAS
HAVING TO CALL FOR ROADSIDE SERVICE UP TO 3-4 TIMES A
WEEK BECAUSE THE BATTERY WOULD DIE OUT ON ME. ALL
THIS TOOK PLACE IN A PERIOD OF 3-4 MONTHS. NOW THIS
BATTERY IS APPROXIMATELY 10-12 MONTHS OLD. WHEN I
TOOK IT IN FOR THE NEW BATTERY, I WAS TOLD THE BATTERY
WAS TO SMALL FOR THE CAR. SO NOW I AM STUCK AT HOME
WITHOUT A VEHICLE UNTIL THE SUBARU SHOP OPENS ON
MONDAY AND HOPEFULLY THEY CAN FIX THE PROBLEM. I'VE
NEVER HAD A 2 YEAR OLD VEHICLE THAT'S GIVEN ME THIS
MANY PROBLEMS.

**Consumer No. 14:**
**Date Complaint Filed:** October 18, 2019
**Date of Incident:** October 14, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11269328
**Consumer Location:** Whippany, NJ
**Summary:** I PURCHASED A BRAND NEW 2019 SUBARU LEGACY
3.6R LIMITED AND 3 MONTHS LATER WITH APPROXIMATELY 900
TOTAL MILES THE BATTERY DIED TWICE WHILE PARKED.

**Consumer No. 15:**
**Date Complaint Filed:** October 20, 2019
**Date of Incident:** October 19, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11269609
**Consumer Location:** Santa Cruz, CA
**Summary:** REPEATED AND UNPREDICTABLE BATTERY FAILURE
WITH NO APPARENT CAUSE, I.E. DOME LIGHTS OR OTHER
ACCESSORIES NOT POWERED "ON"., DOORS OR REAR CARGO

HATCH NOT OPEN. DEALER ANALYSIS OF ELECTRICAL SYSTEM
FOUND NO ISSUES HOWEVER REPLACED BATTERY.

LAST OCCURRENCE 10/19/2019 IN THE HOME GARAGE.FOR
RELIABILITY IT WAS NECESSARY TO PURCHASE A PORTABLE
BOOSTER CHARGER COSTING $100.00.

THERE HAS BEEN 8 SUCH OCCURRENCES SINCE THE PURCHASE
(NEW) IN 2016.

PLEASE ADVISE

**Consumer No. 16:**
**Date Complaint Filed:** November 30, 2019
**Date of Incident:** November 29, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11282979
**Consumer Location:** Dublin, OH
**Summary:** MY CAR WAS PARKED IN MY GARAGE AND HAD NOT
BEEN STARTED FOR ONE DAY. THE BATTERY WOULD NOT
START THE CAR, I HAD TO CALL FOR A JUMP. I WAITED
APPROXIMATELY ONE HOUR FOR SOMEONE TO COME
THROUGH SUBARU ROAD SIDE ASSIST. THE BATTERY WAS
RELATIVELY NEW, AS THE ORIGINAL WAS REPLACED 1/2019. WE
TOOK IT TO THE DEALER AND THEY TESTED THE BATTERY AND
ALTERNATOR, WHICH WERE FINE. THEY RECHARGED THE
BATTERY. I PAID FOR THE BATTERY INSPECTION.

**Consumer No. 17:**
**Date Complaint Filed:** December 12, 2019
**Date of Incident:** August 12, 2019
**Component(s):** Electrical System
**NHTSA ID Number:** 11288705
**Consumer Location:** Crystal Lake, IL
**Summary:** BATTERY DRAINS SO THAT CAR WON'T START. AFTER
HAVING A NEW BATTERY INSTALLED, THE BATTERY IS STILL
SO WEAK THAT THE CAR WILL NOT START, AND THE
ELECTRICAL POWER IS COMPLETELY DRAINED. EVEN THE
CLOCK HAS TO BE RESET. THIS STARTED AROUND 35,000 MILES.

I STOPPED FOR GAS AFTER DRIVING FOR AN HOUR, AND THE CAR WON'T START WITHOUT A JUMP.

**Consumer No. 18:**
**Date Complaint Filed:** February 2, 2020
**Date of Incident:** February 2, 2020
**Component(s):** Electrical System
**NHTSA ID Number:** 11306550
**Consumer Location:** Dewitt, MI
**Summary:** MY 2019 ASCENT WAS PARKED IN GARAGE OVERNIGHT. WENT OUT TO CAR AND FOUND REAR TAILGATE WOULD NOT OPEN AND CAR WOULD NOT START. BATTERY WAS DEAD. JUMPSTARTED CAR AND DROVE IT TO THE STORE. WHEN I PARKED THE CAR IT WENT DEAD, CAR WOULD NOT RESTART, AND WOULD NOT LOCK, TAILGATE WOULD NOT OPEN. HAD TO GET ROADSIDE SERVICE TO COME OUT AND START CAR. TOOK CAR TO DEALER AND THEY SAID THEY COULD NOT FIND ANYTHING WRONG BUT DID REPLACE THE BATTERY. SEVERAL WEEKS LATER WHILE CAR WAS PARKED AND LOCKED IN A STORE PARKING LOT I CAME OUT AND FOUND THE REAR TAILGATE OPEN. NO ONE HAD PUSHED THE REMOTE TO OPEN THE TAILGATE? TODAY I FOUND THE CAR PARKED IN THE GARAGE AND THE TAILGATE WOULD NOT OPEN, THE CAR WOULD NOT START, AND THE BATTERY WAS DEAD AGAIN. I COULD FIND NO REASON FOR THE BATTERY TO BE DEAD AGAIN. THE CAR HAD BEEN DRIVEN NORMALLY AROUND TOWN FOR THE LAST FEW DAYS. IT WAS PARKED IN THE GARAGE. ALL THE DOORS WERE SHUT AND NO LIGHTS HAD BEEN LEFT ON. THE CAR WAS PURCHASED IN JUNE 2019 AND HAS LESS THAN 6000 MILES ON IT PLUS THIS IS A NEW BATTERY. I AM CONCERNED ABOUT DRIVING THE CAR AND BEING LEFT ON THE ROAD BY A DEAD BATTERY OR COMING

OUT AND FINDING THE REAR TAILGATE OPEN IN A PARKING
LOT.

**Consumer No. 19:**
**Date Complaint Filed:** February 15, 2020
**Date of Incident:** February 12, 2020
**Component(s):** Electrical System
**NHTSA ID Number:** 11309279
**Consumer Location:** Portland, OR
**Summary:** CAR SUFFERED 10 UNEXPLAINED ORIGINAL BATTERY
DISCHARGES IN YEARS 2-3 OF OWNERSHIP. UPON JUMP START,
AUTO WOULD START AND OPERATE NORMALLY FOR 2-5
MONTHS BEFORE NEXT DISCHARGE. SUBARU AUTHORIZED
WARRANTY REPLACEMENT THROUGH DEALERSHIP WITH NEW
LARGER POWERED BATTERY AT END OF YEAR 3 OF
OWNERSHIP. REPAIR STATED FAILURE DUE TO BATTERY
LEAKAGE ALTHOUGH NONE WAS OBSERVED BY OWNERS. 13
MONTHS AFTER REPLACEMENT BATTERY WAS INSTALLED, IT
DISCHARGED TWICE IN SAME DAY AND WAS TAKEN TO
ORIGINAL DEALERSHIP (SUBARU OF PORTLAND). SERVICE
TECHNICIAN CHECK DETERMINED BATTERY COULD NOT BE
RECHARGED, COULD NOT DETERMINE REASON FOR ITS
FAILURE, COULD NOT FIND ANY ELECTRICAL PARASITIC
DRAWS AND FOUND ALL SOFTWARE WAS UP TO DATE. OWNER
WAS CHARGED FOR NEW BATTERY AND INSTALLATION AS
FAILED BATTERY WAS NOW OUT OF 1-YEAR SUBARU
REPLACEMENT POLICY. BRIEF INTERNET REVIEW SHOWS THIS
HAS BECOME A COMMON PROBLEM WITH 2016-2017 SUBARU'S.
SUBARU U.S. CORPORATE CUSTOMER CARE DEPARTMENT
DEMONSTRATED NO INTEREST IN TAKING COMPLAINT OR
LOGGING IN ANY DETAIL INFORMATION, DIRECTING OWNER

BACK TO REPAIRING DEALERSHIP. DEALERSHIP CLAIMS NO
RESPONSIBILITY FOR FAILED BATTERIES.

93.     Numerous other Class members have also complained on the internet

and online forums about the Electrical Defect within the Class Vehicles.[9] And, as

several of the complaints above demonstrate, Class members often made their

concerns known to Subaru, either directly or through its authorized dealers.

### c.  Technical Service Bulletins Evidence Subaru's Longstanding Knowledge of the Defect

94.     TSBs are bulletins that vehicle manufacturers issue to alert authorized

service technicians to pervasive issues affecting particular models and model years

of vehicles and, in many cases, recommended procedures for repairing those

vehicles.

95.     Subaru has issued nine TSBs related to the Defect, suggesting that it

learned of the Electrical Defect well before it began to sell and lease the Class

Vehicles.

96.     On February 10, 2015, Subaru issued bulletin #07-89-15R, covering

MY2015 Legacy and Outback models. Through this bulletin, Subaru sought to

address reports that the vehicles would not start, or that electrical components

---

[9] https://www.cargurus.com/Cars/Discussion-t68628_ds816831 (last visited Mar. 10, 2020);
https://www.cargurus.com/Cars/Discussion-t68597_ds845982 (last visited Mar. 10, 2020);
https://www.ascentforums.com/threads/battery-issues.6475/ (last visited Mar. 10, 2020);
https://community.cartalk.com/t/2017-subaru-outback-batteries-died-twice/120574 (last visited Mar. 10,
2020); https://www.subaruforester.org/threads/2017-battery-keeps-dying.795669/ (last visited Mar. 10,
2020).

would suddenly lose power, both symptoms of the Electrical Defect. The bulletin

instructed service technicians to replace all 5 relays in the vehicles' interior and

main fuse boxes in order to "resolve" the issue.

97.    Almost a year later, on January 4, 2016, Subaru revised bulletin #07-

89-15R[10] to extend its applicability to MY2016 Legacy and Outback vehicles to

address reports that the vehicles would not start, or that electrical components

would suddenly lose power.

98.    When the initial TSBs failed to resolve the Defect, Subaru issued

bulletin #07-106-16 on February 8, 2016,[11] in which it instructed technicians to

replace the battery sensor in MY2015-16 Legacy and Outback vehicles.

99.    Subaru's first three TSBs proved ineffective, however, because the

Defect resides in neither vehicle relays nor battery sensors. Subaru thus turned its

attention to potentially inexpensive "fixes": software updates Subaru hoped would

obviate the clear need to effectively repair Class Vehicle electrical systems.

100.    On June 15, 2017, Subaru issued bulletin #11-174-17R,[12] which

covered MY2015-2017 WRX , Outback and Legacy vehicles. Rather than instruct

technicians to replace OEM batteries with batteries with larger capacities, Subaru

merely suggested "[r]eprogram[ing] the ECM following normal FlashWrite

---

[10] https://static.nhtsa.gov/odi/tsbs/2016/SB-10081068-0699.pdf (last visited Mar. 10, 2020).
[11] This bulletin is not publicly available.
[12] The original bulletin, issued June 15, 2017, is not publicly available.

procedure[,]" in order to resolve "[p]otential battery discharge (dead battery) after repeated periods of short-trip driving." Subaru issued a similar bulletin applicable to 2017 Foresters, #11-175-17,[13] on June 20, 2017.

101.   Subaru thereafter revised bulletin #11-174-17R on three separate occasions during 2017—June 23,[14] August 8,[15] and October 31[16]—in order to identify for service technicians an ever expanding list of vehicles that suffer from the Defect. As of October 31, 2017, the bulletin applied to MY2015-17 Legacy, Outback and WRX vehicles, and 2017-18 Forester vehicles.

102.   When its efforts to address battery discharge proved incapable of resolving the Defect, Subaru next attempted to cure it by improving battery charging. Bulletin #11-176-17,[17] issued on November 16, 2017, covers MY2015-2016 Legacy and Outback models, and announced the "availability of reprogramming files to optimize the ECM for control of battery charging

---

[13] https://static.nhtsa.gov/odi/tsbs/2017/MC-10117536-9999.pdf (last visited Mar. 10, 2020).
[14] https://static.nhtsa.gov/odi/tsbs/2017/MC-10117535-9999.pdf (last visited Mar. 10. 2020).
[15] https://static.nhtsa.gov/odi/tsbs/2017/MC-10117543-9999.pdf (last visited Mar. 10. 2020).
[16] https://static.nhtsa.gov/odi/tsbs/2017/MC-10131689-9999.pdf (last visited Mar. 10. 2020).
[17] https://static.nhtsa.gov/odi/tsbs/2017/MC-10125883-9999.pdf (last visited Mar. 10, 2020).

functions" by again reprogramming the ECM in order to "enhance charging system control and . . . improve[ ] battery life."

103.    As the experiences of Plaintiffs and Class members demonstrate, each and every one of Subaru's "fixes" has proven ineffective; more than two years later, consumers continue to complain of premature and unexpected battery failure.

104.    Moreover, given that manufacturers like Subaru issue TSBs only after significant investigation, and that it issued its first relevant TSB in February 2015, it is clear Subaru knew of the Defect well before it placed Class Vehicles into the stream of commerce.

105.    Defendants nevertheless failed to disclose the Electrical Defect to Class Vehicle owners, lessees or potential customers. Likewise, Subaru has never instructed its dealerships to disclose the Electrical Defect to Subaru's customers.

106.    As a result of Subaru's concealment, consumers were unaware they were buying or leasing defective vehicles, and vehicle owners and lessees do not discover the Electrical Defect until after they have been forced to spend their own money prematurely replacing OEM batteries.

107.    As Subaru knows, a reasonable person would consider the Electrical Defect material and central to their purchasing decision, and would not purchase or lease a vehicle if the Electrical Defect had been disclosed in advance, or would have paid substantially less for the vehicle. Batteries are integral to vehicle

functionality—they cannot turn on, let alone operate for the times and distances customers expect, unless manufacturers equip automobiles with a non-defective electrical system capable of providing safe and reliable transportation.

108. The Defect also imposes unreasonable and excessive safety risks on Plaintiffs and Class members, as the exemplar NHTSA complaints referenced above demonstrate. The Defect typically manifests after consumers have turned off their Class Vehicles, effectively stranding operators and their passengers and making them more vulnerable to potential crime, accidents if stranded on a roadside, and other risks that could have otherwise been avoided, such as small children or pets remaining trapped within locked vehicles that cannot be opened after the Defect manifests.

109. Yet, the existence of the Electrical Defect was not known to or reasonably discoverable by Plaintiffs and Class members before such purchase or lease.

110. As of this date, Subaru continues to conceal the Electrical Defect from consumers and the public.

**C.    Subaru's Warranty Practices**

111. Subaru sold and leased Class Vehicles with a written express warranty—the Basic New Vehicle Limited Warranty ("NVLW")—covering the

Vehicles for three years or 36,000 miles, whichever comes first. Subaru's NVLW covers most vehicle components, including vehicle batteries.

112.   Subaru's New Vehicle Limited Warranties expressly "cover[ ] repairs to correct any vehicle defect" and state that repairs will be done within a "reasonable time."

113.   Through its "Replacement Battery Warranty," Subaru also covers replacement batteries for 30,000 miles or the balance of the NVLW, whichever is greater.

114.   Subaru also offers prospective vehicle owners two extended warranty plans: the "Classic Coverage" and "Gold Plus Coverage" plans. These extended warranty plans provide additional warranty coverage for 8-years/100,000 miles or

10-years/120,000 miles,[18] and cover repairs to automotive electrical systems, including electronic control units (ECU) and ECMs.

115.   Subaru provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicle is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

116.   Subaru, however, often evades its warranty obligations, even when vehicles are tendered for repairs within an applicable warranty period.

117.   First, as the experiences of Plaintiffs and absent Class members demonstrate, when owners or lessees tender their vehicles for repair Subaru often informs them that the batteries are performing as expected. Subaru may recharge the battery, but typically instructs vehicle owners to avoid driving Class Vehicles for short distances in order to prevent the Electrical Defect from manifesting. Subaru's "solution," in other words, is to instruct Class members not to use Class Vehicles for their ordinary and intended purpose.

118.   Second, even if Subaru agrees to make warranty repairs, it does so by reprograming vehicle ECMs or ECUs, or replacing failed batteries using similarly

---

[18] https://www.subaru.com/addedsecurity (last visited Mar. 10, 2020).

defective replacement parts that simply delay the inevitable—premature battery failure—until after applicable warranties have expired.

119.   Subaru's failure to correct the Electrical Defect imposes significant out of pocket expenses on Class members. By failing to provide a permanent and effective fix, Subaru effectively evades its warranty obligations and shifts the costs of the Electrical Defect onto its loyal customers. Subaru's warranties thus fail of their essential purpose.

120.   In addition, any efforts by Subaru to limit coverage for the Electrical Defect by relying on durational or substantive limits in its express warranties is unconscionable, and such provisions are unenforceable.

121.   Through the express warranties Subaru issues, Subaru attempts to impose durational limits on those warranties and the implied warranty of merchantability. Subaru, however, provided these warranties to Plaintiffs and Class members after they had completed their purchase/lease of their Class Vehicles; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties, particularly as to coverage for Vehicle batteries and electrical systems. Accordingly, Plaintiffs and Class members suffered from

unequal bargaining power at the time of purchase and least, rendering the limitations on the warranties procedurally unconscionable.

122.    The limitations on the warranties, including the durational and substantive limits Subaru attempts to impose on its express warranties and the implied warranty of merchantability, also are substantively unconscionable. Subaru knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired and failed to disclose these defects to Plaintiffs and the other Class members. Conversely, the Electrical Defect was unknown to, and could not be discovered by, Plaintiffs and Class members until after the Defect had manifested. Thus, Subaru's enforcement of the durational limitations on those warranties is harsh and shocks the conscience

## VII. CLASS ACTION ALLEGATIONS

123.    Plaintiffs bring this action on their own behalf, and on behalf of the nationwide class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3).

**Nationwide Class:**

All persons or entities in the United States who bought or leased a Class Vehicle (the "Nationwide Class").

124.    Pursuant to Fed. R. Civ. P. 23(c)(5), Plaintiffs seek to represent the following Florida and/or Pennsylvania classes only in the event that the Court declines to certify the Nationwide Class:

**Florida Class:**

All persons in Florida who bought or leased a Class Vehicle.

**Pennsylvania Class:**

All persons in Pennsylvania who bought or leased a Class Vehicle.

125.    Together, the Nationwide Class and the Florida and/or Pennsylvania classes shall be collectively referred to herein as the "Class."

126.    Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definitions based on discovery and further investigation.

127.    <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that tens of thousands of Class Vehicles have been sold and leased.

128.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members.

These common legal and factual questions include, but are not limited to whether:

a.    The Class Vehicles were sold or leased with the Electrical Defect;

b.    The Class Vehicles suffer from a continuous parasitic drain within the electrical system;

c.    The continuous parasitic drain within the electrical systems of the Class Vehicles results in premature battery failure;

d.    Subaru knew or should have known about the Electrical Defect;

e.    Although Subaru knew or should have known about the Electrical Defect, it failed to disclose the problem and its consequences to its customers;

f.    A reasonable consumer would consider the Electrical Defect or its consequences material;

g.    Subaru should be required to disclose the existence of the Electrical Defect; and

h.    Defendants' conduct violates the Florida Deceptive and Unfair Trade Practices Act, Pennsylvania Unfair Trade Practices and Consumer Protection Law, and other statutes and common law theories asserted herein.

129.    Typicality: Plaintiffs' claims are typical of the claims of the Class

since Plaintiffs purchased or leased a defective Class Vehicle, as did each member of the Class. Furthermore, Plaintiffs and all Class members sustained economic injuries arising out of Defendants' wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

130.    Adequacy: Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Classes that they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

131.    Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex

legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

132.   Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## VIII. <u>VIOLATIONS ALLEGED</u>

### <u>COUNT I</u>
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. STAT. § 501.201, ET SEQ.)
### (On Behalf of the Florida Subclass)

133.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth and length herein.

134.    Plaintiff Stone brings this claim on behalf of himself and the members of the Florida Class against Defendants.

135.   Plaintiff Stone and the Florida Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

136.   Defendant is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

137.   Defendant omitted disclosure of the known and material fact that the Class Vehicles possess the Electrical Defect. This conduct constitutes unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices within the meaning of Fla. Stat. § 501.204, *et seq*.

138.   Reasonable consumers, like Plaintiffs, would be deceived by Defendant's conduct in promoting the Class Vehicles without disclosing information concerning the Electrical Defect.

139.   As described above, Plaintiffs and the Class suffered damages because the Class Vehicles possess the Defect. The Defect caused Plaintiffs and other Florida Subclass members to sustain damages in the form of loss of use of their vehicles and/or costs of frequent battery replacements.

140.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and the Florida Class Members have suffered harm in that they bought Class Vehicles they otherwise would not have, overpaid for their Class Vehicles, did not receive the benefit of their bargain, and/or their Class Vehicles suffered a diminution in value.

141.   The Class Vehicles do not function as advertised and warranted by Defendant. This condition has caused Plaintiffs' damages, which can be measured with specificity based upon, *inter alia*, the overpayment at the time of purchase, as

well as, cost of parts and labor to secure and complete installation of replacement batteries.

142.    As a result of Defendant's omissions, Plaintiff and the Florida Class suffered actual damages within the meaning of Fla. Stat. § 501.211, because they were or will be forced to pay for parts and labor for replacement of their Class Vehicles' batteries. Additionally, Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

**COUNT II**
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 Pa. Stat. § 201-1, *et seq.*)**
**(On Behalf of the Pennsylvania Class)**

143.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

144.    Plaintiff Albright brings this cause of action on behalf of herself and on behalf of the members of the Pennsylvania Class.

145.    Plaintiff Albright and members of the Pennsylvania Class are natural persons who purchased Class Vehicles for personal, family or household purposes.

146.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" as set forth in the statute. 73 Pa. Stat. § 201-3.

147.    Defendants engaged in unfair and deceptive acts in the conduct of trade or commerce in violation of the PUTPCPL by the practices described above, and by knowingly and intentionally concealing from Plaintiff and Class members that the Class Vehicles suffer from the Defect (and the costs, risks, and diminished value of the vehicles as a result of this problem).  These acts and practices violate, at a minimum, the following sections of PUTPCPL section 201-2:

(4)(ii) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(4)(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

(4)(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

(4)(ix) Advertising goods and services with intent not to sell them as advertised; and

(4)(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

148.    Defendants knowingly concealed and failed to disclose the fact that the Class Vehicles are defective, with the intent that Plaintiff Albright and the proposed class rely upon that concealment, suppression, or omission when purchasing or leasing Class Vehicles. The existence of the Electrical Defect is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair and incidental expenses, requires inconvenient maintenance efforts, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued. Moreover, because the Electrical Defect is latent, Plaintiff Albright and the Pennsylvania Class could not have discovered the Defect until after it manifested in their Class Vehicles.

149.    Following Plaintiff Albright's and proposed Class members' purchase and lease of Class Vehicles, Defendants have continued to conceal and fail to disclose the defect.

150.    As a direct and proximate result of Defendants' conduct, Plaintiff Albright and Pennsylvania Class members have been harmed. Plaintiff Albright and the other Pennsylvania Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Pennsylvania Class members have also incurred and will continue to incur costs for replacement batteries and incidental expenses. Meanwhile, Defendants have

sold more Class Vehicles than they otherwise could have and charged inflated prices for Class Vehicles, thereby unjustly enriching themselves.

151.   Unfair or deceptive acts and practices as defined by the PUTPCPL also include "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made." 73 Pa. Stat. § 201-2(4)(xiv).  Defendants violated the PUTPCPL by refusing to repair Plaintiff Albright's and the Pennsylvania Class' vehicles at no cost to pursuant to the New Vehicle Limited Warranty, or Defendants' "Classic" or "Gold Plus" extended warranties, after the Defect manifested.

152.   Defendants' failure to honor their warranty terms proximately caused injuries to Plaintiff Albright and the Pennsylvania Class.  Had Defendants honored their warranties, Plaintiff and other Class members would not have incurred substantial repair costs.

153.   Pursuant to 73 Pennsylvania Statutes section 201-9.2, Plaintiff Albright requests that the Court grant treble damages.

## COUNT III
## BREACH OF EXPRESS WARRANTY
### (On Behalf of the Nationwide Class
### or, Alternatively, the Florida and/or Pennsylvania Classes)

154.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth and length herein.

155.    Defendants provided all purchasers and lessees of the Class Vehicles with an express three-year/36,000 mile basic bumper-to-bumper warranty, referred to as the New Vehicle Limited Warranty.

156.    The NVLW provided by Defendants on the Class Vehicles became part of the basis of the bargain for consumers who purchased or leased those vehicles.

157.    Defendants likewise sold to certain purchasers of Class Vehicles "Classic" and "Gold Plus" extended warranty plans that provided warranty coverage for eight-years/100,000 miles or 10-years/120,000 miles. Both extended warranty plans purportedly cover repairs to Class Vehicle electrical systems, and became part of the basis of the bargain for consumers who purchased those extended warranty plans.

158.    Accordingly, Defendants' NVLW and extended warranties are express warranties under state law.

159.    The Class Vehicles affected by the Electrical Defect were manufactured and distributed by Defendants and are covered by NVLW Defendants provided to all purchasers and lessees of Class Vehicles, as well as the extended warranties Defendants sold to certain purchasers and lessees of Class Vehicles.

160.    Defendants breached the NVLW and its extended warranties by

selling and leasing Class Vehicles with the Electrical Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

161.   Plaintiffs notified Defendants of their breaches within a reasonable time, and/or were not required to do so because affording Defendants a reasonable opportunity to cure its breaches of written warranties would have been futile. Defendants also knew of the Electrical Defect, and yet chose to conceal it and to fail to comply with their warranty obligations.

162.   As a direct and proximate cause of Defendants' breach, Plaintiffs and the other Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and Class members have also incurred and will continue to incur costs for battery replacement and incidental expenses.

163.   Defendants' attempt to disclaim or limit its express warranties *vis-à-vis* consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendants' warranty limitations are unenforceable because they knowingly sold a defective product without informing consumers about the defect.

164.   The time limits and any substantive limitations contained in

Defendants' warranties also were unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class members had no meaningful choice in determining these limitations in time or coverage, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Subaru and the Class members, and Subaru knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

165.    Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

166.    Plaintiffs and the other proposed Class members are entitled to legal and equitable relief against Defendants, including damages, consequential damages, specific performance, attorney fees, costs of suit, and other relief as appropriate.

## COUNT IV
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of the Nationwide Class or, alternatively, the Florida and/or Pennsylvania Classes)

167.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth and length herein.

168.    Defendants are "merchants" as defined under the Uniform Commercial Code ("UCC").

169.    The Class Vehicles are "goods" as defined under the UCC.

170.    With the sale and lease of each Class Vehicle, Defendants impliedly warranted that the Class Vehicles were of a merchantable quality.

171.    Class Vehicles are not of merchantable quality due to the Electrical Defect, which poses an unreasonable risk to driver safety, and potentially leads to thousands of dollars in repair expenses and incidental charges, as well as inconvenient maintenance.

172.    Defendants' attempt to limit the duration of the applicable warranty period is unconscionable. Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Subaru and Class members, and Subaru knew that the Class Vehicles were defective at the time of sale in that their batteries and would fail well before their useful lives, yet chose to conceal that information, depriving Plaintiffs and Class members of the ability to make an informed decision with respect to their purchase or lease decision.

173.    As a direct and proximate cause of Subaru's breach of implied warranty, Plaintiffs and the other Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

Plaintiffs and Class members have also incurred and will continue to incur incident expenses as a result of the Electrical Defect.

174.   Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## COUNT V
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (On Behalf of the Nationwide Class or, alternatively, the Pennsylvania Class)

175.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

176.   Every contract in Florida and Pennsylvania contain an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

177.   Defendants breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiffs and Class members of the defect in the Class Vehicles, and failing to fully and properly repair this defect.

178.   Defendants acted in bad faith and/or with a malicious motive to deny Plaintiffs and the Class members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## COUNT VI

## BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT
### (15. U.S.C. §§ 2301, *et seq.*)
### (On Behalf of the Nationwide Class or,
### Alternatively, the Florida and/or Pennsylvania Class)

179.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

180.   Plaintiffs and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

181.   Defendant is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5).

182.   The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

183.   Defendant provided Plaintiffs and the Class with one or more express warranties which are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

184.   Defendant breached the express warranties by:

　　a.   Providing a basic warranty of 3 years/36,000 miles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

　　b.   Selling and leasing Class Vehicles with a latent defect that results in premature battery failure; and

    c.  Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, failed batteries in the Class Vehicles.

185.   Plaintiffs and the other Class members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

186.   Defendant's breach of the express warranties has deprived the Plaintiffs and the other Class members of the benefit of their bargain.

187.   The amount in controversy of each Plaintiffs' individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

188.   Defendants have been afforded a reasonable opportunity to cure their breach of written warranties and/or Plaintiffs and the other Class members were not required to do so because affording Defendant a reasonable opportunity to cure its breach of written warranties would have been futile. Defendants were also on notice of the alleged defect from the complaints and service requests they received from Class members, as well as from their own warranty claims, customer complaint data, and/or parts sales data.

189.   As a direct and proximate cause of Defendants' breach of the written

warranties, Plaintiffs and the other Class members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and the other Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

## COUNT VII
### UNJUST ENRICHMENT
### (On Behalf of the Nationwide Class or,
### Alternatively, the Florida and/or Pennsylvania Class)

190.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

191.    As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase of Class Vehicles by Plaintiffs and the Class

192.    Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendants' misconduct, Plaintiffs and the Class would not, and did not, receive Class Vehicles of the quality, nature, fitness, or value that had been represented by Defendants, and that reasonable consumers expected.

193.    Defendants have been unjustly enriched by their fraudulent and deceptive withholding of benefits to Plaintiffs and the Class at the expense of these parties.

194.    Equity and good conscience militate against permitting Defendants to retain these profits and benefits.

195.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and the Class suffered injury and seek an order directing Defendants' disgorgement and the return to Plaintiffs and the classes of the amount each improperly paid to Defendants.

## IX. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the putative Class(es) they seek to represent, respectfully requests that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C.    award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.    award pre-judgment and post-judgment interest on such monetary relief;

E.    grant appropriate injunctive and/or declaratory relief, including,

without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the design defect;

F.    award reasonable attorney's fees and costs; and

G.    grant such further relief that this Court deems appropriate.

## X. <u>JURY DEMAND</u>

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Dated: March 25, 2020              Respectfully submitted,

                    By:    /s/ *Matthew D. Schelkopf*
                           Matthew D. Schelkopf
                           Joseph B. Kenney
                           **Sauder Schelkopf LLC**
                           1109 Lancaster Avenue
                           Berwyn, PA 19312
                           Telephone: (610) 200-0581
                           mds@sstriallawyers.com
                           jbk@sstriallawyers.com

                           Daniel O. Herrera
                           Kaitlin Naughton
                           **Cafferty Clobes Meriwether & Sprengel LLP**
                           150 S. Wacker Drive, Suite 3000
                           Chicago, IL  60606
                           Telephone: (312) 782-4880

dherrera@caffertyclobes.com
knaughton@caffertyclobes.com

***Counsel for Plaintiffs and the putative Class***